GIDDINGS AND OTHERS *vs.* EMERSON.

On the hearing of a bill in chancery against A. B. C. D. E. F. and G., to establish and protect, in the plaintiff, a right to maintain a dam, it appeared that in 1845, A. and B. erected a manufactory upon land then owned by them, and also, upon adjoining land, then owned by C. and D., for the purpose of creating a water power for said manufactory, they erected the dam in question, by means of which the land of A. B. C. D. and E. was flooded, it being mutually agreed that said dam might be maintained so long as the parties could agree, on the payment of seven dollars annually. G. afterward purchased of B. one acre of the land so flooded, and in April, 1853, A. and B., by a warranty-deed, with the usual covenants, conveyed to F. by exact lines, the land, with said manufactory standing thereon, and verbally represented that the dam was appurtenant thereto, and could be maintained for ninety-nine years, at its present height, and that the several owners of the land flooded by means of it would lease the same to him. And G. and D. executed leases for that purpose, reserving therein a stipulated annual rent. In 1854, F. conveyed said land and manufactory to the plaintiff, adding to the description the words "being the same land, and all the same, and none but the same that was deeded to me by A. and B." The plaintiff immediately, and with the knowledge of all the defendants, and without objection from any of them, commenced, and for three months continued to make repairs upon the dam. No rent for the land flooded had ever been paid, either by F., or by the plaintiff, and the time limited for its payment in the leases, having expired, A. and G. removed the dam. Held 1. that C. E. and F. ought not to have been made parties to said bill. 2. That the other defendants were not estopped from denying the plaintiff's right to maintain said dam. 3. That the only right of the plaintiff in the land of G. and D. was acquired by their leases to him. 4. That the plaintiff, having neglected to pay the rent reserved in such leases, the lessors had a right to remove said dam.

THIS was a bill in chancery, brought by Daniel Emerson, against William W. Giddings, Alden Giddings, Jabez W. Giddings, Wooster B. Seymour, Michael Seymour, Sylvester Seymour, and Horace Johnson, praying the court to establish and protect, in the plaintiff, a right to keep and maintain a certain dam, upon the land of two of the defendants.

At the term of the superior court, holden in 1855, the cause was referred to a committee, whose report embraced the following facts :

In the summer of the year 1845, the defendants, William W. and Alden Giddings, erected a sash and blind factory, consisting of one building, with the machinery therein, and a small building for a paint shop, upon the premises described in the plaintiff's bill, and at or about the same time, erected, of wood and stone, in a substantial manner, upon land of the defendants, Michael and Wooster B. Seymour, lying east of, and adjoining, said first named premises, a large dam across a stream of water, which flows by said factory, and contiguous thereto. The dam was erected for the sole purpose of ponding the waters of said stream, and making the same available for propelling the machinery of said sash and blind factory, and was used for that purpose, from the summer of 1845 to the spring of 1850.

The waters of said stream, when so ponded, flowed back upon land of the said William W. and Alden, covering land of said Michael and Wooster B., and land of said Sylvester Seymour, one of the defendants, and so continued to cover the same, down to the time when said dam was partially destroyed, as hereinafter stated; with the exception of a portion of the time after the year 1850, and before the purchase of the premises aforesaid, by Horace Johnson, on the 5th day of April, 1853.

The dam was erected with the consent of said Michael and Wooster B., with their full knowledge that the same was to be used in ponding the waters and flowing the lands aforesaid, for the purpose of making said water available for said factory.

Immediately after the erection of the dam, buildings and machinery, William W. and Alden agreed with Michael and Wooster B. verbally, for the privilege of flowing so much of the land of said Michael and Wooster B. as said dam would then flow, at an annual rent of seven dollars, so long as the parties could agree; and at the same time, made a similar verbal agreement with the defendant, Sylvester Seymour, aforesaid, so long as they could agree on the payment of an

annual rent of seven dollars; conditioned that the said William W. and Alden should erect, for said Sylvester, on a portion of his land flowed, a bridge, and should also keep the same in repair, which they afterward did erect.

After the erection of said dam, and before Johnson purchased said premises, Jabez W. Giddings purchased of said Alden about one acre of the land so flowed, and has ever since owned the same.

On the 5th day of April, A. D. 1853, said William W. and Alden sold and conveyed the premises upon which said factory and buildings are situated, to Horace Johnson, by a warranty deed, in the usual form, without any exception or reservation. At the time said sale was negotiated, William W. represented to Johnson that said dam belonged to said William W. and Alden, and was connected with and appurtenant to said premises and buildings, and they had good right to convey the same; that there would be no difficulty in Johnson's flowing all the land which they had flowed, and all which said dam, at its then present height, would and did flow, on the annual payment by Johnson to the several parties owning said land, of a sum amounting to twenty-two dollars; that he, the said William W., had seen all the owners of said land; that said owners were willing to sign and execute leases, confirming said right in said Johnson, his heirs and assigns, and that said William W. would procure from each of said owners, to wit, Jabez W. Giddings, Wooster B., Michael, and Sylvester Seymour, leases, for that purpose, for a period of ninety-nine years therefrom. In pursuance thereof, William W. on the 11th day of April, 1853, caused to be executed two leases; one from Jabez W. and one from Wooster B., which were to be void on the non-payment of a stipulated rent.

At the time of the purchase by Johnson, the pond was full, and the waters flowed back upon the lands of the several owners aforesaid, to the same extent as they had continued to do, from the time of the erection of the dam to the 7th of April, 1854.

Said Johnson entered into the possession of, and used, the premises described, conveyed to him by said William W. and Alden, in manufacturing in the same manner, and to the same extent they had formerly been used, until the 4th of October, 1854, when he sold the premises, dam and water power, and conveyed the same to the plaintiff, by warranty deed of that date, in the usual form, and the plaintiff immediately entered into possession of the same, the descriptive portion of which was as follows: " A certain piece or parcel of land situated in said Hartford, bounded as follows, to wit: north and west by highway, south by land of Martha Giddings and Sarah Clark, (said boundary being a straight line, running due west, from a point one rod south of the southeast corner of a certain paint shop, standing on said land, to the highway,) east on land of Michael L. Seymour, (said boundary being a straight line, running south from the northeast corner of a sash and blind factory, standing on said premises, to the southern boundary,) containing one quarter of an acre, more or less, together with the buildings thereon standing. Being the same land, all the same, and none but the same, that was deeded to me by William W. Giddings and Alden Giddings, by their deed of April fifth, eighteen hundred and fifty-three."

After taking possession of the premises, said factory continued to be, for a considerable time, operated in the same manner, and by means of the same power, that it had been, during the ownership of said Johnson.

When the last named sale of said premises was in process of negotiation, Johnson represented to the plaintiff that the dam was part of the property to be conveyed by him to the plaintiff, and that the right to flow said land and to use said water, in connection with said factory, was appurtenant to the premises and buildings to be so conveyed; that he purchased said premises of said William W. and Alden, and sold the same to the plaintiff, including said dam, to be used in connection with said water power.

The plaintiff, immediately after his purchase, commenced repairing the dam, buildings, water wheel and machinery, and put the same in good order for manufacturing purposes, at an expense of one thousand dollars. During a period of three months, while such repairs were going on, all the defendants, except William W. and Alden, saw the repairs, as they were made by the plaintiff, and knew that he made them with the intention of using the premises, buildings, wheel and machinery, in connection, and only in connection, with, said power, and for manufacturing purposes; and during all the time the plaintiff was so engaged in making said repairs, he supposed that he had a right to keep the dam where it then stood, and to use the premises, buildings, water wheel and machinery in connection with said water power, all which was well known to the defendants, agreeably to the contracts and agreements entered into by said Johnson and the other defendants, or either or any of them, and said Johnson and the plaintiffs; neither of the defendants ever objected to such use of the same, or informed the plaintiff that he had not the right so to use them, or that the defendants, or either of them, had any rights, or claims, inconsistent with the rights and claims of the plaintiff, except as is hereafter stated.

In the month of January, 1854, William W. Giddings informed the plaintiff that there was a mistake, in the description of the premises, in the deeds of said William W. and Alden to said Johnson, and of said Johnson and the plaintiff, by which mistake, more land was included in said description than was intended by the parties to the first named deed, and requested the plaintiff to give up said land, so included by mistake, and that unless he, the plaintiff, surrendered so much of said land, as was thus included by mistake, he should not be permitted to flow that portion of the land covered by said pond of water, which belonged to said William W.

The plaintiff continued in the use and occupation of the

premises and water power, and continued his repairs upon the dam, buildings and machinery, and kept said dam at the same height it had been previously kept by William W. and Alden and said Johnson, till the 6th day of April, A. D. 1854, when Michael Seymour, in the presence of William W. Giddings, requested the plaintiff to give up the land, which was, by mistake, included in his deed, and informed the plaintiff that if he did not surrender all right to the land so included by mistake, he, said Michael, would give said William W. authority to pull down the plaintiff's dam. The plaintiff declined to give up the land, as required, claiming that the same belonged to him. On the morning of the 7th day of April, said William W. and Jabez W. proceeded to tear down said dam, or so much thereof as was necessary to draw off the waters of said pond, and prevent the same from accumulating therein, so as to be available for any use whatever, in connection with said factory and premises of the plaintiff; and the said Jabez, Michael, Wooster B. and Sylvester, afterward occupied and used the land, formerly covered by the waters of said pond, for agricultural purposes.

On the morning before said dam was thus torn down, and after the time limited in said lease, within which said rent was to be paid, said Jabez W. told the plaintiff that said lease was forfeited, by reason of the non-payment of rent, and the plaintiff replied that he would have nothing to say to him.

The premises are of little value, except for manufacturing purposes in connection with said water power.

Said Johnson, after he conveyed the premises to the plaintiff, informed him for the first time, that there was an annua rent to be paid to the owners of the land, amounting in all to the sum of twenty-two dollars each year.

The annual rent, which Johnson agreed to pay to the several owners of the land aforesaid, for the privilege of flowing the same, was twenty-two dollars, to be paid as follows, to wit: eight dollars to said Sylvester Seymour, seven dollars to Michael and Wooster B. Seymour aforesaid, and

seven dollars to Jabez W. Giddings, which sums, the committee found, were a reasonable rent therefor.

No demand was ever made of the plaintiff for rent, and none ever paid, either by said Johnson or the plaintiff, to said Jabez W. or Wooster B. under the leases aforesaid.

The superior court, at the term holden in December, 1855, accepted said report, and decreed that said dam and water power, and the right to use said water power appurtenant to, and annexed to, said premises, conveyed by said William W. and Alden Giddings, to said Johnson, by their deed of April 11, 1853, and by said Johnson to the plaintiff; and also the right to keep, restore, maintain, and continue said dam, at the height it was at the date of said respective deeds, viz.: the 11th day of April 1853, and the 4th day of October, 1853, and the right to pond and flow, and to continue to pond and flow, all the lands, which were, or might have been, or might be, ponded and flowed by keeping and maintaining said dam at its then height, and also the right to repair, renew and strengthen said dam, as might be reasonably necessary, and to enter on the lands of the defendants, so far as might be necessary reasonably to make said repairs, all which said rights, so decreed and declared to be appurtenant to said premises, were decreed to vest in the plaintiff as owner of the same, and in all those who should hold from, or under him, for the period of ninety-nine years from the 11th day of April, 1853, at and after which time all such rights, so decreed to be appurtenant, should cease.

The court further decreed that the plaintiff, and all who should hold said premises from, or under him, should pay the rent provided for, in the several leases from the aforesaid Michael, Wooster B., and Jabez W., in pursuance of the stipulations in said leases; that the plaintiff should keep and maintain a sufficient bridge upon land of said Sylvester Seymour, and also enjoined the defendants, and each of them, from, in any manner, molesting or disturbing the plaintiff in his right to pond and flow the land of the defend-

ants, and the right to maintain said dam at its former height, and decreed that the plaintiff recover of the defendant his costs.

To obtain a reversal of this decree, the defendants, by motion in error, brought the record before this court for revision.

*Hubbard* in support of the motion.

*Welles* and *Eaton* against the motion.

ELLSWORTH, J. This is a bill in chancery to establish in the plaintiff a right to maintain a certain dam upon the land of two of the defendants; likewise to flow their land, and the land of others of the defendants. The case discloses that the plaintiff owns a quarter of an acre of land, and a shop, which he purchased of Horace Johnson, by deed, dated the 4th day of October, 1853, which land and shop, Johnson purchased of William W. Giddings and Alden Giddings, in the April preceding; both deeds make use of the same language in describing the premises. It is worthy of note, that the deed to the plaintiff has in it the further words, " being the same land, all the same, and none but the same, that was deeded to me by William W. Giddings and Alden Giddings, by their deed of April 5th, 1853." Both deeds give the exact lines and visible boundaries of the grant, with unusual minuteness and particularity; and it is obvious, that when the plaintiff purchased, and when his grantor, before him, purchased, the premises were examined, or were already well known and understood by the parties. There is not a word in the deeds about drain, or right of flowage, and as these easements were, and must have been seen to be, without the limits and boundaries mentioned, it would seem that the plaintiff must have seen, that he did not acquire, by any specific description in the deed, the rights he now demands, but that he expected to obtain them, from some other quarter. The

deed, too, is with easements, but the land and shop alone are specifically mentioned. The word appurtenances, is in the subsequent and printed part of the deed, and may have its proper effect, and were it agreed as correct in law, that this word was enough to carry, along with the land, the artificial easements enjoyed at the time, in connexion with it, it is by no means certain, that it would include any more, or other easements, than the grantor was legally entitled to, as connected with the thing specifically granted. The word, appurtenance, does not necessarily define the exact measure or extent of the thing, said to be appurtenant; and as under the leases, there existed legal appurtenances, we are not prepared to say that the word appurtenance, merely, following a specific grant, as in this instance, can be construed to embrace any thing more than that legal appurtenance. *Manning* v. *Smith,* 6 Conn. R., 291. 3 Cru. Dig., 47, § 51. *Whaley* v. *Thompson,* 1 B. and P., 371. *Grant* v. *Chase,* 17 Mass., 443.

The dam stood on the land of Michael Seymour and Wooster B. Seymour, and it set back water upon their land, and the land of Sylvester Seymour, and Jabez W. Giddings. The question now is, how have these persons lost the use of their land, and by what means, and principles of law, has the plaintiff acquired the easements he claims. The statutes of the state prescribe a mode of acquiring such rights, to which we naturally look, when such rights are claimed, but no deeds, or leases, are set up, or pretended by the plaintiff, nor a title by possession, nor any title whatever by conveyance, but only that these land owners are estopped from claiming their own property; not that they have been paid any thing, but such are the circumstances in the case, such the acts of the plaintiff and the silence of the defendants, that it would be a fraud in the defendants now to come forward and claim their lands, after what has openly taken place. Such a right to another man's farm, all will agree, should be clearly and satisfactorily made out or be abandoned; every

presumption of law, and of fact, is against it, especially when mere silence is the circumstance to conclude the party, as in this case. Silence, at the best, in relation to the use and occupation of real estate, as a ground of title by estoppel, is very unsatisfactory, and objectionable, if the doctrine of estoppel be allowed in such case at all. The rule is laid down in *Pickard* v. *Sears*, 6 Adol. and El., 469, in a manner as satisfactory as in any other case, or in any treatise. In substance it is this: if a party wilfully misrepresents a state of things, and induces another to act upon a belief in the truth of his representation, and that person does so act upon it, to his prejudice, the party who makes the representation is estopped from proving the truth; it is a bar to the evidence being received and acted upon. But this, as has been said of all estoppels, is odious, and the conditions, which warrant its application, must be clearly proved. The misrepresentation must be, if not absolutely wilful, grossly careless and culpable, and intended to induce the other to act upon it to his prejudice, and the other must have acted upon it to his prejudice. We refer further to *Howard* v. *Hudson*, 20 E. L. and Eq., 52. *Freeman* v. *Cook*, 2 Exch., 654, and the numerous cases in our own reports, where this doctrine has been most largely discussed, and repeatedly decided.

Let us now turn our attention to the facts and circumstances which are claimed to justify the application of this doctrine to these defendants. At the time William W. Giddings and Alden Giddings made the dam in question, knowing they had no right to use the land lying without the limits of their said quarter of an acre, they got leave of Michael Seymour and Wooster B. Seymour, who owned, and still own the land, where the dam was placed, to build their dam there, and flow their land, during the pleasure of the parties, by paying them the annual sum of seven dollars; and a like agreement was made with Sylvester Seymour, for the use of his land, at the same rent. When William W. Giddings, and Alden Giddings, sold to Johnson, the plain-

tiff's grantor, in April, 1853, they distinctly told him, under what leases they had enjoyed their water power, and informed him that he could have the same rights renewed to him, by paying the same rent, and William W. Giddings said that he would himself get leases from them for ninety-nine years, and likewise from Jabez W. Giddings, who had now become a proprietor of some of the land which was flowed. Leases were given for ninety-nine years, by said Wooster B. and Jabez W., to Johnson, bearing date the 11th of April, 1852, and whether Michael Seymour, or Sylvester Seymour, gave leases, does not appear, nor whether they objected to Johnson's flowing their lands, under the verbal agreements with William W. Giddings, and Alden Giddings, and they had never expressed a wish to put an end to those parol leases. When, after all this, Johnson came to sell the premises to the plaintiff, he described the entire subject matter with the exactness and particularity already mentioned, saying not a word in the deed about a privilege on other persons' lands. Now, the record finds, that whatever the defendants knew of the plaintiff's view, or belief, (upon which he now claims the estoppel,) as to his title or rights when he bought, or afterward, while he was expending his money, it was known by the defendants, in the language of the report, as follows : " All which was well known by the respondents, agreeably to the contracts and agreements entered into by, or between, the said Johnson and the other respondents, or either, or any of them, and said Johnson and the petitioner, as found in their report." Our interpretation of this language of the report is, that the plaintiff, at the time he purchased the premises of his grantor, Johnson, was informed of the character and limit of Johnson's right, as one in fee only of the land described in the deed, with the leases to flow other lands, at an annual rent. At any rate, we see nothing here, upon which to build the doctrine of estoppel. And we are more inclined to this opinion, from what we have already stated, that the plaintiff must have known that his deed was a barren

grant of a specific piece of land, or quarter of an acre, and no more, so far as the lines and boundaries are to speak of the things granted. We are by no means satisfied that, during all the time, the defendants did not truly believe, that their leases were binding and operative, and that the plaintiff wished it to be so, and so understood it, and hence knew of no occasion to speak to the plaintiff, when they saw him repairing his dam, and fitting the shop and machinery for his uses.

Much has been said about an equitable estoppel in this case; that it would be unjust, and fraudulent, in the defendants, after what the plaintiff has done for them, to insist upon their legal rights by removing the dam. This whole doctrine of equitable estoppel by matter *in pais*, when applied to real estate, the title to which is matter of public record, is to be considered, and applied, with extreme care, and caution. It may be applied, we allow, in a perfectly clear case, as where, to let in the truth would operate as a palpable, if not a meditated fraud, but it must be a clear case indeed, much more so than the one now before the court, for here the application of the rule would only protect the careless, the indolent and the presumptuous, to the injury of those who were fairly and justly relying upon their clear and undoubted rights. The very decree, itself, shows the misapplication of the doctrine contended for, for wherein is it inequitable, and fraudulent, for the defendants to assert their rights to their lands, if it be true that the plaintiff was flowing their lands by license, or under leases, which the plaintiff will not keep, but repudiates, and by so doing, has brought on himself the destruction of which he complains,— which leases the decree establishes as correct, and requires the plaintiff to conform to, and pay the annual rent for ninety-nine years.

The decree is inconsistent on its face, since it confirms the leases, and it finds matter for an equitable estoppel against the defendants, as if they had no existence.

Under these circumstances, we are satisfied that the plaintiff ought to be considered as holding no rights over the lands of the defendants, but what he holds under, and according to, the leases, and as he refused to pay the rent when it was due, and demanded, and this refusal was continued after the time allowed for payment, the lessors and owners of the lands had a right to resume possession of their own, and had full right, themselves, or by the assistance of others, to remove the dam, which was a nuisance.

We do not see the propriety of making Sylvester Seymour, and Wooster B. Seymour, and Johnson, defendants, under any view of this case. Since the first two have done nothing to injure the plaintiffs, and have threatened nothing, there can be no decree, of course, against them. Nor has Johnson any connection with the controversy whatever, nor is he liable to any one, so far as we perceive; if he is, the remedy against him would be at law, for damages.

There is manifest error.

In this opinion, the other judges, STORRS and HINMAN, concurred.

Decree reversed.